# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 18, 2012

## STATE OF TENNESSEE v. BRIAN JERMAINE DODSON

**Direct Appeal from the Circuit Court for Maury County**
**No. 18714      Stella L. Hargrove, Judge**

---

**No. M2011-00523-CCA-R3-CD - Filed June 27, 2012**

---

The defendant, Brian Jermaine Dodson, was convicted by a Maury County Circuit Court jury of first degree premeditated murder, attempted first degree murder, and aggravated assault and sentenced to an effective term of life imprisonment. On appeal, he argues that: (1) the trial court erred in allowing the State to amend counts two and three of the indictment over his objection; (2) the trial court erred in allowing a State witness, Adrian Walker, to testify concerning gang activity and in failing to grant his motion in limine regarding Walker's testimony; (3) the evidence is insufficient to support his convictions; (4) the trial court erred in failing to instruct the jury on alibi; (5) the trial court erred in allowing the defendant's prior convictions to be introduced during trial; (6) newly discovered evidence could have affected the outcome of the trial; and (7) the State committed prosecutorial misconduct by using perjured testimony and an improper closing argument, the cumulative effect of which deprived him of a fair trial. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee (on appeal); and Stanley K. Pierchoski, Lawrenceburg, Tennessee (at trial), for the appellant, Brian Jermaine Dodson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Mike Bottoms, District Attorney General; and Kimberly Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

According to the State's proof at trial, cousins Kim Malone and Crystal McKee were stabbed around 3:30 or 3:45 a.m. on December 14, 2008, in an apartment at Parkview Manor Apartments in Maury County, Tennessee. As a result, the defendant was indicted for the first degree premeditated murder of Malone and the attempted first degree murder and aggravated assault of McKee.

### State's Proof

Officer Michael Brian Gray of the Columbia Police Department testified that he was on duty on December 13, 2008, when he made a traffic stop of a speeding vehicle around 9:50 p.m. Brook Lee was driving the vehicle, and the defendant was the passenger. The defendant provided Officer Gray with two identification cards – one showing a Memphis address and one showing a Columbia address. Officer Gray's patrol car was equipped with video equipment, and, accordingly, the traffic stop was recorded.

Officer Gray recalled that the defendant was wearing a "blue and white checkered flannel jacket" at the time of the stop and then later described it as a "blue and black, checkered flannel coat." He noted that the defendant's clothes appeared to be clean and had no visible dirt or bloodstains on them. Because the defendant was wearing a toboggan-style hat, Officer Gray could not see his hair. However, he did see that the defendant had a "small beard." Officer Gray ultimately described that the defendant was wearing "a woolen white checkered jacket with a white or gray-colored undershirt. Black like dickie pants and a black toboggan[,]" and a blue bandana around his neck. Officer Gray noted that the blue lights of his patrol car cast a blueish sheen on the color of the clothes on the videotape. The defendant was searched during the traffic stop, and no knife was found on him.

Officer Sarah Howell with the Columbia Police Department testified that she was on patrol the night of the offenses and responded to a reported stabbing at Parkview Manor Apartments around 3:45 a.m. on December 14, 2008. The dispatch information was that a male and a female had been stabbed. Officer Howell pulled into the apartment complex and drove to the last building at the end of the drive where she saw a woman standing at the bottom of the stairs. The woman was slouched over and had blood on her shirt, obviously bleeding from her chest area. Officer Howell alerted other officers that she had located the possible victim.

Officer Howell testified that as she got out of her car and started walking toward the woman, the woman turned around and walked toward an apartment. Officer Howell followed the woman to the apartment and initially stood right inside the doorway. The woman was in the middle of the living room on her knees, having trouble breathing and "seemed kind of like she was in shock." The woman also appeared as though she was "[p]ossibly" under the influence of a narcotic.

Officer Howell testified that the woman identified herself as Crystal McKee and said that her cousin, Kim Malone, was dead. When Officer Howell asked McKee where Malone was, McKee said that she was in the kitchen. McKee told Officer Howell that she had been in the back of the apartment cleaning a bedroom when she heard Malone ("the victim") screaming. McKee said that she walked into the living room and saw a black male, whom she knew as "Lok," with his hands around the victim. At that point, "Lok" left the victim alone and approached McKee. He then proceeded to stab her with a long blade. McKee could not recall what "Lok" was wearing. Officer Howell asked McKee if the stabbing was related to "a drug deal gone bad," and McKee answered, "[N]o. It had something to do with whiskey," that "Lok" wanted her whiskey.

Officer Howell testified that, once backup officers arrived and cleared the scene, she walked into the apartment and found the victim lying facedown on the kitchen floor. The victim's head was in a pool of blood and there was a large, open laceration on the left side of her neck. The victim did not have a pulse.

Crystal McKee testified that, in December 2008, the victim was thirty-seven years old and lived alone at Parkview Manor Apartments. On December 13, 2008, around noon, McKee went to the victim's apartment to charge her cell phone. Shortly after arriving at the victim's apartment, McKee and the victim took "a couple puffs of crack." The victim's boyfriend, Don, was also at the apartment, and he asked McKee to go Christmas shopping with the victim later that day. The two left around 2:00 p.m. and then returned to the apartment when they were finished shopping.

McKee testified that, shortly after returning to the apartment, she went to watch a movie at William Reece's home. After the movie, she returned to the victim's apartment. Around 3:00 a.m., someone started knocking loudly on the apartment door and calling the victim's phone. The two were in the bedroom in the back of the apartment at the time. The victim answered some of the calls but ignored others. She appeared irritated and rolled her eyes. Eventually, the victim went to answer the door. On cross-examination, McKee said that the knock on the door that the victim went to answer occurred sometime between 3:00 and 3:30 a.m.

McKee testified that eight to ten minutes after the victim went to answer the door, she heard the victim screaming and went to see what was happening. McKee looked around the corner and saw a man holding the victim around the waist, repeatedly stabbing her in the back, smiling the entire time. McKee exclaimed, "Oh, my God. She can't survive that," and the man looked directly at McKee and started "tearing" at the victim's throat with the knife. The man laid the victim down on the floor and approached McKee. He began stabbing her, so she grabbed a nearby fan to try to push him away. She attempted to dial 911, and the man stabbed her in the back. When he pulled the knife out, she misdialed the emergency number.

McKee testified that she was able to run to the bathroom and lock the door. She then called 911. She heard what sounded like a cabinet door slamming, looked out of the bathroom, and saw the chain on the front door swinging. Believing that the man was gone, McKee exited the bathroom to look for the emergency personnel. McKee waited outside for what "felt like forever" and then went back inside to be near the victim.

McKee testified that, when the police arrived, she was kneeling down on her knees in the living room, and she pointed the officer to where the victim was lying. At the time, McKee felt like she was going into shock and was losing a lot of blood. The officer asked McKee if she knew who had stabbed the victim, and McKee said, "Lok" and gave a description of what "Lok" was wearing. McKee said that she immediately recognized the attacker and said that she knew him as "Lok." She had seen him at the victim's apartment on previous occasions but had never had a conversation with him or known where he lived. On the night of the stabbing, he was wearing a white cap on top of a "black blue bandana" and a blue and black flannel coat. McKee identified the defendant in court as the attacker and the person she knew as "Lok."

McKee testified that she was transported to the trauma unit at Vanderbilt Hospital and was in and out of the hospital for three months because hematomas kept building up in the area under her left chest. McKee talked to Detective Duncan while she was in the trauma unit, about four or five hours after the stabbing, and told him "Lok" was the person responsible for the stabbing.

Donald Ray Burkett testified that he dated the victim for eight years and that he was at her house the day prior to her murder. He recalled that he arrived around 7:30 a.m., McKee arrived around 11:00 a.m., and then he left around noon. He said that he did not see McKee smoke any crack cocaine while he was there. He remembered that the victim's cell phone number was 931-286-1569.

Nathan Donovan testified that he worked with the defendant at Southern Glass Company in Nashville for four months and that the defendant was known as "Lok" there.

Due to the large size of the job site, Donovan gave the defendant a prepaid cell phone in order to communicate with him there. Once he gave the defendant the phone, he never saw it again.

Kimberly Cooper, an employee of AT&T, provided the phone records for telephone number 615-838-9586, which was assigned to Donovan's subscriber information. The records showed that a call was made to the victim's cell phone at 3:34 a.m. on December 14, 2008, and the length of the call was forty-one seconds. At 3:37 a.m., there was an incoming call from the victim's phone number that went to voicemail. Also at 3:37 a.m., there was a call to the victim's phone number from Donovan's number that lasted five seconds. Again, at 3:37 a.m., there was another incoming call from the victim's phone number, with a duration of zero seconds. Lastly, also at 3:37 a.m., Donovan's number called the victim's phone number, and the call lasted fifty-seven seconds.

Adrian Walker, who was presently incarcerated in the Williamson County Jail on a probation violation for a theft conviction, testified that he was incarcerated with the defendant in early 2009 in the Maury County Jail. The two shared a cell together, during which time the defendant told him about a situation where two women who owed him $300 "got cut up . . . reasonably bad" and that it was "messed up." Walker said that the defendant told him that he had been preparing to go out of town for his birthday and "basically was going to collect the money," but the women did not have it. The defendant told him that he went to the home of a woman named Lena after the attack and changed his clothes at her house. The defendant also told him that the State did not have the knife. The defendant showed him black and white photographs of the murder scene and the two victims.

Walker testified that, on another occasion when he and the defendant were in the same cell in June 2009, the defendant showed him color photographs of the murder scene and told him that the State "had dropped the ball . . . because they picked up the dumpster and . . . [it] went into the trash container instead of . . . driving straight to the detective's office." When showing Walker the photographs, the defendant said that the women "got really messed up." The defendant mentioned to him several times that "it was just about 300 dollars." On cross-examination, Walker testified that he also saw photographs of a dumpster and a lot of trash but, when presented with the discovery photographs, he was unable to point to any photograph that showed a dumpster. On redirect examination, Walker testified that the reason he wrote a letter to the defendant while he was in the Williamson County Jail was "because [he] had been getting stress from certain groups of Crypt[1] individuals in [his] jail" and was trying "to save [him]self."

---

[1]We have utilized the spelling found in the transcript, which we presume is phonetic. The correct spelling may be "Crip," which is a street gang.

Officer Andre Martin with the Columbia Police Department testified that he was instructed to retrieve a dumpster from Parkview Manor Apartments on December 15, 2008, at 10:00 a.m. because officers believed the defendant had placed a bag inside that dumpster. Officer Martin went to the apartment complex with a garbage truck and a flatbed truck and instructed the driver of the garbage truck to pick up the dumpster in front of Building G and place it on the flatbed truck. Once on the truck, the dumpster was to be taken to the police department to be searched. Instead of following the instructions, however, the garbage truck emptied the dumpster into the garbage truck. Officers had to search through the contents of the garbage truck for a black plastic bag but did not find the bag they were looking for.

Detective Cory Cooper with the Columbia Police Department testified that he reported to the crime scene around 4:00 a.m. on December 14, 2008, and was responsible for processing the scene, which included taking photographs and collecting evidence. Detective Cooper stated that his notes reflected that McKee told him her attacker was wearing "a blue flannel shirt, tan pants, pj-type[, and a] blue bandana."

Dr. Amy McMaster, qualified as an expert in the field of forensic pathology, testified that she performed the autopsy on the victim. Dr. McMaster noted that the victim suffered sixteen stab or cut wounds to various areas of her body. Dr. McMaster surmised that the stab wound to the left side of the victim's chest that injured the left lung and the four stab wounds to her back that injured her ribs, spine, and spinal cord would have been fatal.

Helen Blackman Hannah testified that she knew the defendant in December 2008, and he went by the nickname "Lok." She recalled that the defendant showed up at her house between 8:00 and 8:30 a.m. on December 14, 2008, and he was not wearing the "toboggan hat" that he normally wore and had shaved his mustache. She was not sure how much hair he had previously due to his always wearing a hat, but she observed that he did not have any hair on his head that morning. Asked if the defendant had any eyebrows that morning, Hannah said that she "d[id]n't remember seeing much . . . hair on his face at all that morning." She also noted that the defendant often wore a black or blue plaid jacket, and he was not wearing it that morning.

Detective Jeff Duncan with the Columbia Police Department testified that he was the lead detective in this case and responded to the scene shortly after 4:00 a.m. on December 14, 2008. Thereafter, he traveled to Vanderbilt Hospital to talk to Crystal McKee, who was coherent but "appeared to be still in shock." McKee gave him a description of what had happened and of her attacker. Detective Duncan learned of a traffic stop that occurred the night before and watched the videotape of the stop. He also spoke to Nathan Donovan due to Donovan's connection to the phone number that had made calls to the victim's phone. As a result of the police investigation, the defendant was developed as the suspect. The

officers located the defendant's apartment, and Detective Duncan noted that it was approximately fifty yards from the victim's apartment. Officers executed a search warrant on the defendant's residence but did not discover the items they were looking for. They were eventually able to locate the defendant, and an examination of him revealed no evidence of cuts or bleeding. Detective Duncan directed the submission of numerous items to the lab for testing.

**Defendant's Proof**

Agent Hunter Greene, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, testified that she examined items of evidence submitted in this case for latent fingerprints, and her examination failed to reveal the presence of any identifiable prints.

Cassandra Beavers, a forensic scientist with the TBI Crime Laboratory, testified that she tested both a white rock substance and a rock substance submitted in this case. Testing of one of the items did not indicate the presence of any controlled substance, but testing of the other item revealed the presence of cocaine base.

Agent Charles Hardy, a forensic scientist in the Swab and DNA Unit of the TBI Crime Laboratory, testified that he tested various samples submitted in this case for the presence of blood and DNA. Agent Hardy's testing revealed, among other things, that the defendant's DNA was not present in a sample of blood collected from the bathroom sink drain of his apartment. A sample of blood collected from the sofa in the defendant's apartment revealed a mixture of genetic material from at least three individuals, with a female being the major contributor to the mixture but the victim and McKee were excluded as the possible contributors. The defendant's DNA was not found on any blood samples collected from the victim's apartment, nor was the victim's or McKee's DNA found on any blood samples collected from the defendant's apartment. On cross-examination, Agent Hardy noted that there were three samples, two of which were blood samples, obtained from the victim's apartment from which he was unable to generate a DNA profile.

Johnnie Ruth Polk testified that she lived next door to the victim at Parkview Manor Apartments in December 2008. Polk stated that someone knocked on her door around 3:00 or 3:30 a.m. on December 14, 2008, and, when she answered it, she saw a girl named Crystal who informed her that the victim was dead. Polk could not tell if Crystal was hurt, and Crystal did not tell her that she was hurt.

Brook Lee testified that she lived at 320 Roberts Drive in the Parkview Manor Apartments in December 2008. Lee and the defendant were engaged at the time, and he

stayed with her "from time to time." On December 13, she and the defendant left her apartment around 9:00 p.m. to get something to eat, but they ended up stopping at two different gas stations. After leaving the second gas station, they were pulled over by a police officer. Thereafter, sometime around 10:30 or 10:45 p.m., they went to a car wash. They finally went back to Lee's apartment around midnight.

Lee testified that, at her apartment, she and the defendant ate and watched a movie, which ended around 2:00 or 2:15 a.m. At some point, both Lee and the defendant fell asleep, but Lee was awakened around 3:00 a.m. when she heard the door open and discovered that the defendant was going outside. He told her that he was going to smoke and let the dog out, then he returned shortly thereafter. Once the defendant was back inside the apartment, Lee fell asleep again but woke up when she heard someone knocking on the door. Looking through the peephole, Lee saw that a woman named "Banks" who lived in the apartment complex was at the door, but Lee did not open it. The defendant asked who was at the door, and Lee told him. A few minutes later, the defendant walked outside and was gone about fifteen minutes. It was approximately 3:30 a.m. at the time.

Lee testified that the defendant looked the same when he returned as he had when he left. He was wearing dark pants, a flannel shirt, and a jacket. She thought he also had on his toboggan hat and a do-rag. The defendant was not out of breath or excited and did not have any blood on him. Once back in the apartment, the defendant sat on the couch for fifteen minutes and then took a shower. Five minutes later, Lee heard sirens. When the defendant got out of the shower, Lee got into bed. The defendant put on his work clothes and joined her. Shortly thereafter, the defendant got up to get ready for work and left around 5:00 a.m. Lee noted that, when the defendant got out of the shower, he had shaved his head. He explained to her that growing out his hair was "'just too high maintenance[.]'" The defendant had also shaved his beard and eyebrows. Lee stated that she did not observe the defendant talking on the phone the entire time they were together that evening and early morning, aside from during the traffic stop.

Clifford Bowen, an assistant in counsel's law office, testified that he filed a request for discovery in this case on March 2, 2009, and that they would have received the discovery within a week after the request. He recalled that there were photographs in the discovery. He sent copies of the photographs to the defendant along with the rest of the discovery materials. He initially sent the defendant thumbnail-sized black and white photographs and then later sent him larger-sized color photographs. Bowen said that he was familiar with all 714 photographs and said there was no photograph of a dumpster with trash in it or a photograph of a garbage truck. On cross-examination, Bowen acknowledged that information concerning the dumpster was in the State's file, which he received because of open file discovery and passed along to the defendant. On redirect, Bowen stated that he did

-8-

not send the defendant any photographs before January 22, 2009, as they had not received them at that time.

Darius Hawkins testified that he and the defendant were cell mates in the Maury County Jail from December 2008 until February 2009. Another inmate, Adrian Walker, was also in the cell with them for a one or two-week period in late January. Hawkins said that he never heard the defendant talking about his case. He also never saw Walker looking through the defendant's paperwork.

Officer Jason Dark with the Columbia Police Department testified that he was on the surveillance team assigned to observe the defendant's apartment on December 15, 2008. Around 7:30 or 8:00 that morning, a black male exited the apartment carrying a black plastic trash bag, which he placed in the dumpster. Officer Dark said that he was not able to identify the man.

Officer Paul McCormick with the Columbia Police Department testified that later in the day of the stabbing, he was in the area around the defendant's apartment and saw a "heavy-set dark-haired female," whom he believed to be the defendant's girlfriend, holding a spray bottle of cleaner and a bottle of bleach.

Antonio Turentine testified that he was at the Parkview Manor Apartments in December 2008, the night before the stabbing incident, to attend a cookout for his cousin's birthday. Antonio's[2] cousin lived in the apartment above the defendant and his girlfriend. The cookout started around 5:00 or 6:00 p.m. and lasted until 2:00 or 2:30 a.m. When Antonio was leaving the party, he saw the defendant outside with a puppy, either rolling up the windows of his car or making sure his car was locked.

Randall Turentine testified that he used to "hang out" at Parkview Manor Apartments and remembered a time he attended a party there with his cousin, Antonio. Randall recalled that he saw the defendant sometime during that evening when "it was just getting dark" outside.

The defendant testified that he lived with his girlfriend, Brook Lee, at 320 Roberts Drive in December 2008. Early in the evening of December 13, 2008, the defendant was alone at the apartment, so he stopped by a party that was going on in the apartment upstairs and talked to some people, specifically the "Turentine boys." Around 7:00 or 8:00 p.m., the defendant and Lee left the apartment and "rode around . . . contemplating . . . where [they]

_____

[2] Two of the witnesses have the same last name and will be referred to by first name only at times for clarity. We mean no disrespect by this practice.

wanted to go." They eventually decided to go to Nashville but were pulled over by the police before heading in that direction. After the traffic stop, they went to a car wash and then decided to return to Lee's apartment because it was around midnight.

The defendant testified that, back at the apartment, he turned up the heat and took off his flannel jacket and hat. Lee prepared dinner, and the two sat down to watch a movie around 12:15 or 12:30 a.m. After they finished watching the movie, there was a knock on the door. Lee went to the door and saw that it was Ms. Banks, who also lived in the complex, at the door. The defendant explained that Ms. Banks was an elderly lady who sometimes came over to ask for cigarettes.

The defendant testified that, around 3:10 or 3:15 a.m., he left the apartment to take his puppy out and go to his car to get his cigarettes and have a smoke. He estimated that he was outside for about five minutes before he went back in. The defendant explained that it was not unusual for him to be outside at that hour because he worked for a company in Nashville and had to be at work at 6:00 a.m. As such, he would typically get up around 3:30 or 4:00 a.m. to get ready for work.

The defendant testified that he went back outside five to ten minutes later, around 3:30 or 3:40 a.m. He let the puppy out again and went to his car to roll up the windows and lock the door. When he return to the apartment, he sat on the couch and watched television for fifteen to twenty minutes. After that, he shaved his head, beard, and eyebrows and took a shower.

The defendant testified that, while he was in the shower, Lee came in and told him that there had been a stabbing or shooting in the apartment complex. The defendant told her to stay away from the window in case someone was outside shooting. After his shower, the defendant dressed in lounge clothes and got into bed. He woke up around 5:00 or 5:30 a.m., ate breakfast, and left the apartment.

The defendant testified that he had a cell phone at the time with the number 615-838-9536, which was the cell phone he was talking on during the traffic stop. However, the phone was somehow misplaced after the traffic stop, so he did not have it when they returned to 320 Roberts Drive that night. He speculated that he may have left the phone at the car wash or at a store they stopped by afterwards.

The defendant testified that he met the victim in the summer of 2008 when she was having car trouble, and he helped start her car. He knew that the victim lived in an apartment in the building adjacent to his girlfriend's building and talked to her on the phone and visited her apartment occasionally. He had seen Crystal McKee before but had never

had a conversation with her. The defendant denied going to the victim's apartment or calling her on the night of the incident. The defendant said that he had not received any discovery photographs in January 2009 – the first time he and Adrian Walker were housed together in the Maury County Jail.

On cross-examination, the defendant recalled that he showed Adrian Walker some black and white photographs of the crime scene but said that he did not recall showing Walker any color photographs. However, he said that he did not tell Walker that the women were stabbed because they owed him $300 for drugs. The defendant admitted that he received a copy of his case file from counsel and was aware of the situation regarding the contents of the dumpster being lost, but he denied mentioning anything about that to Walker.

**Rebuttal Proof**

Brook Lee denied knowing the defendant to be a drug dealer or ever telling Detective Cooper that the defendant sold crack.

Detective Cooper testified that he interviewed the defendant, and the defendant told him that "Lok" was not his nickname. The defendant denied making any telephone calls to the victim within the day or two leading up to her murder. Detective Cooper said that Brook Lee told him when he interviewed her that the defendant sold crack cocaine.

After the conclusion of the proof, the jury convicted the defendant of the first degree premeditated murder of Kim Malone and the attempted first degree murder and aggravated assault of Crystal McKee.

## ANALYSIS

### I. Amendment of Indictment

The defendant first argues that the trial court erred in allowing the State to amend counts two and three of the indictment over his objection and after jeopardy attached.

Immediately after the jury was sworn, but prior to the reading of the indictment, defense counsel moved to dismiss counts two and three of the indictment for lack of jurisdiction because those counts charged that the respective offenses took place in Lawrence County, rather than in Maury County where the evidence was going to show the offenses took place. In response, the State moved to amend counts two and three to allege that they occurred in Maury County. The defense responded that it did not consent to the amendment and that its consent was required after the attachment of jeopardy, which

occurred when the jury was sworn. The court denied the defendant's motion to dismiss, stating:

> If [venue is] not an element then why is it such a fatal flaw? I mean, during the course of the proof, clearly the State has the burden to prove by a preponderance of the evidence . . . . I'm going to deny [the defense motion]. . . . There's been an open file discovery. I understand your strategy in bringing this at this time. However, it just seems blatantly unfair to . . . require the State to dismiss these two [counts] at this time. . . . Certainly . . . there's no new offenses raised. His rights, he's not prejudiced.

Rule 7(b)(2) of the Tennessee Rules of Criminal Procedure provides that, before jeopardy attaches, a trial court may allow amendment to an indictment without the defendant's consent when "no additional or different offense is charged and no substantial right of the defendant is prejudiced." Id. 7(b)(2). However, once jeopardy attaches, an indictment may only be amended by consent of the defendant. Id. 7(b)(1); see State v. Todd, 654 S.W.2d 379, 382 (Tenn. 1983) (Jeopardy attaches in a jury case after the jury is impaneled and sworn.). The decision to grant or deny a motion to amend an indictment rests within the sound discretion of the trial court, and this court will not alter that decision absent an abuse of discretion. See State v. Kennedy, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999).

Rule 12(b)(2)(B) of the Tennessee Rules of Criminal Procedure provides that a motion alleging a defect in the indictment, presentment, or information must be raised before trial, but that "at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense[.]" Id. "'Lack of jurisdiction' refers to subject matter jurisdiction," State v. Nixon, 977 S.W.2d 119, 120 (Tenn. Crim. App. 1997), which refers to a court's authority to adjudicate a dispute brought before it. Freeman v. CSX Transp., Inc., 359 S.W.3d 171, 176 (Tenn. Ct. App. 2010). "Venue, on the other hand, does not affect the court's authority to rule on matters before it[.]" Id. Defects in the indictment that go to form, rather than substance, must be raised prior to trial or will result in waiver. Nixon, 977 S.W.2d at 121. Examples of these type of defects include: "failure of the district attorney general to sign the indictment, the identity of the person charged, the time at which the offense was committed, and *the place of the offense*." Id. (emphasis added). "It is not necessary for the indictment to allege where the offense was committed, but the proof shall show a state of facts bringing the offense within the jurisdiction of the county in which the indictment was preferred." Tenn. Code Ann. § 40-13-208.

In this case, count one of the indictment correctly alleges that the crime occurred in Maury County; whereas, counts two and three incorrectly allege that the crimes occurred in

Lawrence County. This defect is of the type that must be raised prior to trial or result in waiver. As such, by failing to object prior to trial, the defendant has waived his issue. Tenn. R. Crim. P. 12(b)(2), 12(f). In any event, even if the court erred in allowing the State to amend the indictments, such error was harmless because the top of the indictment clearly indicates it is from Maury County, the defendant knew the crimes were alleged to have occurred in Maury County, and the indictment in no way misled or misinformed the defendant of the charges against him.

## II. Witness Adrian Walker

The defendant alleges several errors with regard to witness Adrian Walker's testimony. Specifically, he asserts that the trial court erred in allowing Walker to testify concerning gang activity; that the court erred in failing to grant his motion in limine to prevent Walker from testifying; and that the State violated its duty to provide exculpatory evidence regarding a TBI interview of Walker.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. See State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Tennessee Rule of Evidence 401, which governs the initial issue of admissibility, requires the trial court to first determine whether the proffered evidence is relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 provides that, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

Before trial, defense counsel had a conversation with the prosecution and the court concerning the defendant's association with a gang not being delved into during trial. The court noted that there needed to be a jury-out hearing prior to anything being mentioned concerning a gang. Thereafter, during the State's redirect examination of Walker, the prosecutor asked Walker why he wrote the letter to the defendant in 2009 that he had been questioned about on cross-examination, to which Walker responded that he "had been getting stress from certain groups of Crypt individuals in [the] jail[.]" Defense counsel objected, and the State responded that the defendant had opened the door by introducing the letter and that Walker was entitled to explain why he wrote it. The court ruled that it would allow Walker to explain why he wrote the letter to the defendant.

The defendant also filed a motion in limine to exclude Adrian Walker's testimony because Walker's testimony would reveal to the jury that the defendant was in custody after his arrest which would "irrevocably harm the [d]efendant's right to the presumption of

innocence[.]"  The court noted that just because the defendant was in custody at the time of his conversation with Walker did not give the jury any reason to believe that he was still in custody at the time of trial. The court agreed with the argument by the State that the defendant's wearing street clothes at trial would take away any presumption of guilt that might arise from knowledge of his post-arrest incarceration.  The court offered to give a limiting instruction, but the defendant declined.

Even though the defendant mentions on appeal these issues concerning Walker's testifying about gang activity and being allowed to testify in general, he offers no specific argument as to why the court erred in allowing Walker to testify on redirect concerning the reason he wrote the letter to the defendant, aside from asserting that he was "prejudicially denied the ability to impeach . . . Walker's credibility regarding his gang-related testimony due to the State's failure to provide the defense with exculpatory evidence."  As such, we conclude that the defendant failed to prove that the trial court abused its discretion in allowing gang-related testimony, and we will address the exculpatory evidence allegation below.  In addition, the defendant argues on appeal concerning Walker's being allowed to testify in general, not that Walker's testimony revealed to the jury that the defendant was in custody after his arrest which "irrevocably harm[ed] [his] right to the presumption of innocence" as he argued in his motion in limine, but, instead, that Walker's testimony was "manufactured and/or speculative in nature" and the State "used Walker's false testimony to wrongly convict [him]."  "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal."  State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (citing State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993)).

In any event, the defendant points to Walker's testimony that the defendant had showed him photographs of a dumpster as being the "false testimony" he complains that the State used to convict him.  However, such testimony was actually elicited by the defense on cross-examination. On direct, Walker testified that the defendant told him when they were incarcerated together the second time that the State had "dropped the ball" by emptying the dumpster into the trash container instead of keeping the contents separate for inspection.  There was no mention of any photographs of a dumpster.  Then, on cross-examination, defense counsel asked Walker if he saw photographs of the dumpster, to which Walker responded that he did.  However, when he was presented with the discovery photographs, Walker was unable to find any photographs of a dumpster, and the defense thoroughly cross-examined Walker about the photographs and his knowledge of them.  There is simply no proof that the State used false testimony to convict the defendant.

Tied into these issues, the defendant asserts that the State failed to supply him with exculpatory evidence concerning Walker, specifically evidence of the TBI's interview of

Walker on November 20, 2009. He claims that he would have been able to more fully cross-examine Walker to impeach his credibility had he been provided the exculpatory evidence.

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the prosecution has a duty to furnish to the defendant exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. The Court explained that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

At the motion for new trial hearing, the defendant introduced a summary of TBI Agent Brad Elliott's November 20, 2009 interview with Adrian Walker concerning Walker's interview by an investigator sent by defense counsel the previous day in which Walker was essentially intimidated. In the summary, the TBI agent detailed that Walker reported, among other things, that the investigator showed him that she had personal contact information for Walker's loved ones that she was going to share with the defendant and that the defendant considered Walker "a snitch." The investigator informed Walker that the defendant was affiliated with a gang and that "the defense had a good case until Walker got involved." Walker reported that the investigator asked him if he knew the meaning of the defendant's tattoos: one being that the defendant had committed a homicide, one being that he was a member of the Shotgun Crip gang out of Los Angeles, and one being that he "uses knives up close and personal and allegedly ha[d] stabbed a prison guard before." The aspects of the summary that the defendant alleges as exculpatory are that the investigator asked Walker "about photographs of a dumpster and Walker stated he had no knowledge of that" and because Walker failed to mention that he had been threatened by the Crips gang into writing a letter to the defendant.

Upon review, we question how the TBI summary could be deemed favorable to the defendant or "material," i.e., that there is a reasonable probability that the result of the proceeding would have been different had it been disclosed to the defense, because the summary, as a whole, casts the defendant in a *very* egregious light. In any event, even if it was error for the State to not disclose the summary, such error was harmless because Walker

was thoroughly cross-examined about his knowledge of the dumpster and the vast majority of the TBI summary would have been highly damaging to the defense, beyond any minute benefit that might have been gained in cross-examination.

### III. Jury Instructions

The defendant argues that the trial court erred in failing to give the jury an instruction on alibi when it was fairly raised by the evidence. He asserts that proof of his alibi came by way of the testimonies of Brook Lee, Antonio Turentine, and himself.

Brook Lee testified that, on the evening of the offenses, she and the defendant watched a movie at her apartment, which ended around 2:00 or 2:15 a.m. Lee said that she and the defendant fell asleep, but she was awakened around 3:00 a.m. when she heard the door open and discovered that the defendant was going outside. He told her that he was going to smoke and let the dog out, then he returned shortly thereafter. Lee said that the defendant went outside again around 3:30 a.m. and was gone approximately fifteen minutes.

Antonio Turentine testified that he was attending a party at the Parkview Manor Apartments the morning of the incident and, when he was leaving around 2:00 or 2:30 a.m., he saw the defendant outside with a puppy and either rolling up the windows of his car or making sure his car was locked.

The defendant testified that, around 3:10 or 3:15 a.m., he left Lee's apartment to take his puppy out and go to his car to get his cigarettes and have a smoke. He said that he was outside for about five minutes and then went back in. The defendant testified that he went back outside five to ten minutes later, around 3:30 or 3:40 a.m., to let his puppy out again and roll up his car windows and lock the door.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). The trial court must instruct the jury on the defense of alibi when it is "fairly raised" by the evidence, see Manning v. State, 500 S.W.2d 913, 915 (Tenn. 1973), regardless of whether the defendant requests the instruction. See Poe v. State, 370 S.W.2d 488, 491 (Tenn. 1963). Proof of an alibi sufficient to require an instruction exists where (1) the defendant's claim that he was not at the scene of the crime is corroborated by other credible witnesses; (2) the victim has

-16-

been unable to identify the defendant; or (3) the proof against the defendant is wholly circumstantial. Manning, 500 S.W.2d at 916. The failure to charge the jury with alibi when it has been fairly raised by credible evidence is reversible error. Moffitt v. State, 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999).

Upon review, we conclude that an instruction on alibi was not warranted in this case because the defendant's claim that he was not at the crime scene was not corroborated. In fact, the defendant's primary alibi witness, Brook Lee, testified that the defendant left her apartment twice during those early morning hours, once being around 3:30 a.m. for a period of fifteen minutes. Lee's apartment was only fifty yards away from the victim's apartment, in the same complex. The evidence at trial showed that police officers responded to the scene around 3:45 a.m. The defendant's other alibi witness, Antonio Turentine, could only vouch for the defendant's whereabouts at 2:00 or 2:30 a.m., much earlier than the time of the offenses.

In any event, even if the trial court erred in not instructing the jury on alibi, the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of the defendant's guilt. Crystal McKee, the surviving victim, testified that she saw the defendant stab the victim multiple times and then proceeded to stab her at close range. She said that she recognized the defendant immediately as she had seen him at the victim's apartment on previous occasions. The description McKee gave of the attacker's clothing was similar to what the defendant had been wearing earlier in the evening when he was pulled over by the police. Moreover, evidence of calls made from the defendant's cell phone to the victim corroborated McKee's testimony of someone calling the victim before the murder.

## IV. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing there is insufficient proof of his identity as the perpetrator of the offenses. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754

-17-

S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The identification of a defendant as the perpetrator of a crime is a question of fact for the trier of fact to determine from the evidence presented at trial. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. Id.

> The reliability of an in-court identification depends on the totality of the circumstances, "including the opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the offender, the level of certainty of the witness at the confrontation, and the length of time between the crime and the confrontation."

State v. Lindsey, 208 S.W.3d 432, 444 (Tenn. Crim. App. 2006) (quoting State v. Beal, 614 S.W.2d 77, 82 (Tenn. Crim. App. 1981)).

We conclude that the evidence, when viewed in the light most favorable to the State, is sufficient to establish the defendant's identity as the man who stabbed the victim and Crystal McKee. McKee, the surviving victim, testified that, when she came around the corner in response to the victim's screams, she saw a man repeatedly stabbing the victim and then look directly at her before cutting the victim's throat with the knife. The attacker laid the victim down on the floor and moved on to stabbing McKee, who was eventually able to

-18-

get away and call 911. McKee testified that the attacker's face was uncovered, and she recognized him as "Lok," having seen him on previous occasions at the victim's apartment. Officer Howell, the first officer to arrive on the scene, recalled that McKee reported to her that a man named "Lok" was the attacker. McKee identified the defendant in court as the attacker and person she knew as "Lok." In addition, other testimony and evidence established that the defendant was nicknamed "Lok," that he called the victim in the time frame leading up to her death, and that he shaved off all his hair and facial hair after returning to Lee's apartment the second time that morning. Moreover, Adrian Walker testified that, when he was incarcerated with the defendant, the defendant told him about a situation where two women who owed him $300 "got cut up . . . reasonably bad" and that it was "messed up." We note that any questions concerning McKee's ability to identify the defendant or the credibility of Walker's or any other witnesses' testimony were resolved by the jury as the trier of fact. Based on this evidence, a rational trier of fact could have found the defendant guilty of first degree premeditated murder, attempted first degree murder, and aggravated assault.

## V. Prior Convictions

The defendant argues that the trial court erred in allowing his two prior aggravated assault convictions to be introduced at trial. Prior to the defendant's testifying, the court ruled that the defendant's prior convictions could not be used for impeachment but that if the defendant opened the door concerning his credibility, the court would readdress the issue. The defendant later testified and, when asked on direct examination if he stabbed Crystal McKee, responded, "No, I did not. I did not. I'm not that type of person." When the issue was revisited prior to the State's cross-examination of the defendant, the court ruled that it would allow the convictions to come into evidence, stating:

> But I have to go back and weigh . . . the . . . relevance of the impeaching conviction on the issue of credibility. And I have to find some way to explain how the impeaching conviction is relevant to his credibility.
>
> And if it is probative of his credibility then I have to go further and assess the similarity between the crimes on trial and the crimes underlying the impeaching convictions.
>
> If the crime on trial is substantially similar then there's always that danger of propensity. Ah, if he did it then it's likely he'd do it now. That type stuff, type issues.
>
> And so . . . now I have to decide, first of all, the relevance. . . . I do

-19-

think that because [the defendant] took the stand that the probative value certainly is heightened as to his past. . . . [I]t becomes important.

Now, this court let in a conviction of aggravated assault saying it was probative of his credibility. That case did not go any further than the Court of Appeals. I do have some difficulty on a conviction of aggravated assault being probative of credibility with an alibi defense with the same issues at trial as to prior conviction.

However, . . . this defendant went further . . . when he said "I'm not the kind of person who would do something like that." Certainly we have a similarity. But similarity alone is not the question. We have to go further.

And the court is going to allow the two convictions. They will be asked simply of [the defendant], whether or not they exist and nothing further. There are two convictions of aggravated assault. Nothing else will be said about that. Certainly no details.

The court finds, after weighing the - doing the test here, that the probative value is not outweighed by the prejudicial effect. I think that [the defendant] has put this at issue, not only with the alibi but moreover with his statement "I'm not the kind of person who would do something like that."

The defendant asserts that the trial court's analysis was improper and incomplete and that the court's recollection of his statement "provided the court a more compelling basis to allow the convictions tha[n] actually existed."

A conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Tenn. R. Evid. 609; State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

Two factors should be considered when deciding whether the probative value of a prior conviction outweighs its unfair prejudicial effect. Mixon, 983 S.W.2d at 674. First,

"[a] trial court should . . . analyze the relevance the impeaching conviction has to the issue of credibility." Id. (citation omitted). Second, if the trial court finds that the prior conviction is probative of the defendant's credibility, then the court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 at 376 (3d ed. 1995)). The more similar the impeaching conviction is to the offense for which the defendant is on trial, the greater the risk of a prejudicial effect to the defendant. Id.

This court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

The trial court considered the similarity between the charged crimes and the defendant's prior convictions of aggravated assault but determined that, while there was certainly a similarity, the defendant testified that he did not stab McKee because "[he was] not that type of person." Thus, the defendant made his credibility and character for violent crimes against others an issue by asserting that he would not commit such a crime. In State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996), this court held that "[i]rrespective of admissibility under Rule 609 [of Tennessee Rules of Evidence], a conviction may be used to contradict a witness who 'opens the door' and testifies on direct examination that he or she has never been convicted of a crime, or to counter some other facet of direct testimony." (internal quotations omitted).

We also note that "[t]he fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citations omitted). Here, the court concluded that the probative value concerning the defendant's credibility outweighed the prejudicial effect potentially due to the similarity of the offenses. Upon review, we conclude that the trial court did not abuse its discretion in allowing the defendant's prior convictions for aggravated assault to be introduced at trial. Moreover, with regard to the defendant's assertion that the court's recollection of his response, "I'm not the kind of person who would do something like that," gave the court a more compelling reason to allow the convictions than actually existed, we note that his actual answer, "I'm not that type of person," when in response to the question of whether he stabbed Crystal McKee, is essentially the same thing. In any event, any possible error in allowing the prior convictions was harmless in light of the evidence against the defendant.

## VI. Newly Discovered Evidence

The defendant argues that newly discovered evidence, consisting of the testimony of

Kendall Jordan that would have impeached Crystal McKee's identification of him as the assailant, entitled him to a new trial. The defendant actually raised the issue simultaneously in his motion for new trial and in a petition for writ of error coram nobis. We will address this issue from the denial of the motion for new trial because the writ of error coram nobis is reserved for matters that were not or could not have been litigated on a motion for a new trial, and that is clearly not the case here. Tenn. Code Ann. § 40-26-105(b).

As proof of newly discovered evidence, the defendant called Kendall Jordan to testify at the motion for new trial. Asked whether Crystal McKee ever talked to him about a situation where she was stabbed and her cousin was killed, Jordan responded, "[S]he didn't tell me about how she got stabbed. She just said like . . . she wasn't familiar because she was so messed up, she didn't know who was there or not." Asked to elaborate on what he recalled McKee telling him, Jordan said, "She just told me like, she didn't know who was . . . like, she didn't know. Because she was in shock, I guess. It's been a minute ago. It's like, I don't . . . I forget stuff. It's like, I don't know about like that. I don't know nothing about that." Jordan stated that McKee did not mention anyone's name and then stated that McKee said she did not know who was responsible for the stabbing. Jordan stated that he told the defendant what McKee had told him and assumed he had done so after the defendant's trial was over because the defendant was incarcerated.

Asked on cross-examination whether his discussion with the defendant could have been before the defendant's trial, Jordan responded, "I don't know. I don't keep up with stuff like that because . . . I've got my own problems." However, he said that it could not have been before March 2010 because he was not in jail prior to that time. Jordan was unsure of when during the prior year that McKee told him the information about her not knowing who was in the apartment at the time of the stabbing, and he admitted that they were all drinking when McKee gave him the information.

To be entitled to a new trial on the basis of newly discovered evidence, a defendant must show (1) that he or she used reasonable diligence in seeking the newly discovered evidence; (2) that the new evidence is material; and (3) that the new evidence will likely change the result of the trial. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). The trial court is to determine the "'credibility of newly discovered evidence for which a new trial is asked,'" and the motion should be denied unless the court is assured that the testimony would be worthy of belief by the jury. See State v. Walker, 910 S.W.2d 381, 395 (Tenn. 1995) (quoting Rosenthal v. State, 292 S.W.2d 1, 5 (Tenn. 1956)). When the newly discovered evidence could have no other effect than to "discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness," the trial court should not order a new trial "unless . . . the evidence impeaching the witness [was] so strong and convincing that a different result at trial would necessarily follow." State v. Rogers, 703

-22-

S.W.2d 166, 169 (Tenn. Crim. App. 1985). Whether to grant a new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997).

Upon review, we cannot conclude that the trial court abused its discretion in denying the defendant a new trial based on newly discovered evidence. Kendall Jordan's testimony at the motion for new trial hearing was very unclear and not specific, particularly with regard to what McKee allegedly told him. He repeatedly said, "I don't know" and that he had forgotten "stuff." He could not state with any certainty when McKee told him the alleged information and admitted that they had all been drinking when McKee made the statement. In light of Jordan's vague testimony, the trial court acted within its discretion in concluding that the new evidence would not have likely changed the result of trial.

## VII. Prosecutorial Misconduct

The defendant argues that the State committed prosecutorial misconduct by using perjured testimony in its case-in-chief and by making improper statements during closing argument.

With regard to the defendant's contention that the State used the perjured testimony of Adrian Walker and the "inaccurate and/or speculative testimony" of Crystal McKee to convict him, we note that the testimonies of Walker and McKee have both been thoroughly addressed above. The credibility of the witnesses was a determination for the jury. The defendant is not entitled to relief on this issue.

With regard to the defendant's allegations of prosecutorial misconduct during closing argument, the State argues that the defendant waived the issue by failing to make a contemporaneous objection at trial. In his reply brief, without conceding waiver, the defendant submits that this court can review the issue under a plain-error analysis. As the defendant failed to make a contemporaneous objection to any of the allegedly improper statements at trial, we conclude that he has indeed waived this issue, see State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives any later complaint), but we will review for plain error.

In order for us to find plain error:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, they must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

Here, the defendant argues that the State's closing argument was improper or inaccurate in the following ways: stating that the defendant's bloody clothes were lost in

the dumpster; stating that the defendant bragged to Adrian Walker that the State had no proof against him; stating that the defendant talked to some people after he allegedly lost his phone; interjecting personal opinion regarding Walker's testimony; stating that the defendant bragged to Walker; stating that Walker was not happy to hear how the victim was killed; stating that the defendant put the victim on the floor like a piece of garbage; and stating that the defense was "'dragging bloody rags' across the trails of justice." However, we have reviewed the relevant portions of the transcript of the closing argument, as well as the testimony at trial, and determined that all of the prosecutor's statements were well within the bounds of acceptable argument. In particular, we note that the allegedly improper statement about the defense "'dragging bloody rags' across the trails of justice" was not an impugning of the defense in the case but a statement regarding what "some old lawyers refer to [as a defense's effort to mislead the jury with 'red herrings']." As such, we conclude that there was no clear and unequivocal rule of law breached in this case and, accordingly, no plain error.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE